DANIEL VLIET, DEFENDANT IN ERROR, v. ISABELLA EAST-
BURN, PLAINTIFF IN ERROR.

Argued March 12, 1900—Decided June 18, 1900.

1. The contract of a married woman who signs a promissory note for the
accommodation of the payee, is that of a surety within the meaning of
the first proviso of section 5 of the Married Women's act, as amended
in 1895 (*Gen. Stat., p.* 2017), and her want of power to bind herself
by such a contract can be set up by her as a defence to a suit at law
upon the note.

2. The second proviso, contained in section 5 of the Married Women's
act, as amended in 1895, declares "that if, *on the faith of* any * * *
contract of suretyship, * * * any married woman obtains, directly
or indirectly, any money, property or other thing of value for her own

use or for the use, benefit or advantage of her separate estate, she shall be liable thereon as though she were unmarried." *Held*, that, by force of this proviso, the reception by a married woman from the payee of a promissory note, of a money consideration for her act in signing the same for his accommodation, makes her liable thereon to the same extent as if she were a *feme sole*.

---

On error to the Middlesex Circuit Court.

For the plaintiff in error, *Alan H. Strong.*

The plaintiff in error, together with Robert Eastburn, her husband, was sued upon a joint and several promissory note for $2,080 made by them to the order of Charles T. Cowenhoven and endorsed by him and delivered to Daniel Vliet, the plaintiff.

Upon the first trial, a judgment was recovered against both defendants, which was set aside as to the plaintiff in error upon the advisory opinion of the Supreme Court, reported in 34 *Vroom* 450. The judgment brought up by this writ of error was the result of a re-trial of the case as against the wife alone.

The note in question was the third or fourth renewal in part of an original note of like character which the evidence tended to show had been given for the accommodation of the payee, and upon which he had received the face amount less a proper discount from the plaintiff, Daniel Vliet, before maturity. No part of the money paid by Vliet in any form went to the benefit of Mrs. Eastburn or was received by her. There was evidence to show that she was paid by Judge Cowenhoven at the time of signing the first note, and upon each renewal of it, $80, as a bonus for the use of her name. There was no other consideration beneficial to Mrs. Eastburn, unless the jury found that there had been an exchange of notes.

It appeared that Judge Cowenhoven had given his note to Mrs. Eastburn of the same date and amount. It was, however, at least doubtful whether there was intended to be an exchange of notes, or whether Judge Cowenhoven's note was

anything more than a mere memorandum, in which case the court charged it would not be a consideration for Mrs. Eastburn's note.

Upon the assumption that there was no exchange of notes, and that the only benefit obtained by Mrs. Eastburn was the payment of $80 upon each occasion that she made or renewed the accommodation note, the court charged : " Did Mrs. Eastburn, when she signed that note, obtain directly or indirectly any money, property, or thing of value, for her own use, or for the use, benefit or advantage of her separate estate ? If she did, she is liable." And again, a married woman " may give her note to anyone to sell on the market and raise money, he to take care of it and protect her, if he pays her for the use of her name." And further, that in such case " it is for her and not for the jurors to measure the adequacy of the consideration."

The court also charged in reference to certain checks given by Judge Cowenhoven to Mrs. Eastburn that " if they were given for bonus to her order and endorsed by her, and she knew that they were given for and knowingly obtained them for her own benefit or the benefit of her estate, she would be liable."

These portions of the charge were severally excepted to and are duly assigned for error.

Under the influence of these instructions the jury rendered a verdict for $2,263.74, the full amount of the note and interest.

The only question raised by these exceptions is as to the proper construction of the act of June 13th, 1895, amending the fifth section of the Married Women's act.

From the above statement of facts it is apparent that the judgment rests upon the proposition that under the law of this state (by force of that amendment) a married woman can bind herself in any case by an accommodation note, provided that she obtains from the person accommodated something of benefit to her (no matter how small in comparison with the

amount of liability incurred) by way of bonus for the use of her name.

I am unable to believe that such is the true construction of the statute in question.

It reads as follows (*Gen. Stat.*, p. 2017, §§ 26, 27): "That any married woman shall, after the passing of this act, have the right to bind herself by contract with any person in the same manner and to the same extent as though she were unmarried, which contracts shall be legal and obligatory, and may be enforced at law or in equity, by or against such married woman, in her own name, apart from her husband; *provided* that nothing herein shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt, or answer for the default or liability of any other person; *provided further, however, that if on the faith of any endorsement, contract of guaranty or suretyship, promise to pay the debt or to answer for the default or liability of any other person, any married woman obtains, directly or indirectly, any money, property or other thing of value, for her own use, or for the use, benefit or advantage of her separate estate, she shall be liable thereon as though she were unmarried, anything herein contained to the contrary notwithstanding.*"

### THE OLD LAW AND THE MISCHIEF.

The last proviso (italicized above) was the only change made by the amendatory act of 1895. Except for this addition the section is precisely as it was originally passed in the Revision of 1875, page 637, section 5.

Independent of this last proviso, it is unquestionable that contracts of suretyship or for the accommodation of others made by married women were void, as they had always been at common law. They were still governed by the common law. *Van Deventer* v. *Van Deventer*, 17 *Vroom* 460; *Todd* v. *Bailey*, 29 *Id.* 10.

At common law the principle of estoppel could not operate in any case to give effect to a married woman's contract.

All her contracts were void, and she could not do indirectly by estoppel that which she could not do by the direct force of her contract. *Cannam* v. *Farmer*, 3 *Exch.* 698 ; *Loan Association* v. *Fairhurst*, 9 *Id.* 422 ; *Den, Hopper* v. *Demarest*, 1 *Zab.* 525, 541 ; *Lowell* v. *Daniels*, 2 *Gray* 161 ; *Big. Estop* (5th ed.) 604.

It would seem that the rule should still be the same (unless expressly altered by statute) in respect to the class of contracts which are still beyond the power of a married woman to make.

At all events it was in 1895 at least an unsettled question in this state whether a married woman could by means of an estoppel connected with the contract make herself liable at law upon a contract of suretyship.

The case of *Hackettstown Bank* v. *Ming*, 7 *Dick. Ch. Rep.* 156 (decided in November, 1893), had recently called attention under circumstances of marked injustice to the other contracting party to a possibility that a married woman might, as the law then stood, obtain money or property from an innocent party on the faith of a contract of suretyship, and not be liable thereon.

The facts of that case (which may well be supposed to have been the occasion of the passage of this amendatory act) were as follows : Ming, desiring to raise money for his own use, procured his wife and another to make a note to his (the husband's) order, which he was to have discounted for his accommodation. He did so, and obtained a check (from the bank through one of its directors) for the proceeds of the discount payable to the order of the wife, which she endorsed and delivered to him, to be used in payment of a debt of his own. The bank was chargeable with notice that the note was without consideration, but not that it was intended by the wife as an accommodation.

In a suit at law on the note a judgment by default was opened, the Justice of the Supreme Court who granted the

application for this purpose giving his reasons in the following memorandum :

"*First.* This action could not be sustained at law against her (Mrs. Ming) under authority of *National Bank* v. *Brewster,* 20 *Vroom* 231.

"*Second.* If the bank could undoubtedly recover on the note in equity, I should hesitate to open the judgment simply to turn it over to another court, but to recover in equity I think the bank would have to show a transaction by Mrs. Ming, not with her husband, according to the terms of the note, but with the bank.

"*Third.* That will raise the other question started, namely, whether the original character of accommodation maker, which plainly was the character Mrs. Ming assumed when she made the note, was afterwards changed by what occurred between her husband and Welsh, and by her receiving and endorsing Welsh's check. I will express no opinion on this, except to say that if that question can be litigated at law, I should think there was in it such a defence that Mrs. Ming ought to be permitted to set it up so that she might review any ruling made thereon, which she could not do if I refused to open the judgment."

The defendant having pleaded so as to raise the questions suggested in this memorandum, the plaintiff filed a bill in equity and obtained a decree for the amount of the note. Vice Chancellor Pitney, who decided the case, held that by endorsing the check for the proceeds the wife became the borrower of the money (thus altering the position which she had originally intended to assume) and could not change her position to one of suretyship by handing the same back to her husband for his own use. The Vice Chancellor also held (*obiter*) that the wife was estopped by the form of her contract to allege that it was one of suretyship, and further remarked that aside from the fact that the note was in form a promise by the wife to the husband the merits might have been tried at law.

But in spite of these *dicta* of the Court of Equity (which could not be taken as settling the question at law) the fact remains that a Justice of the Supreme Court had held that there was in the facts stated at least such a defence as the wife should be permitted to set up in a form to be passed upon by the court of last resort.

The third clause of the memorandum set forth in the Vice Chancellor's opinion (7 *Dick. Ch. Rep.* 158) suggests the question whether what occurred between the husband and the director of the bank, followed by the endorsement of the check by the wife, altered the position of the wife from that of an accommodation maker to that of a principal debtor, but leaves it to be inferred that in case the position of the wife was not thus altered in law, but she remained in effect a surety, her reception of the proceeds of the discount would not make her liable.

The cases of *Perkins* v. *Elliott*, 8 *C. E. Gr.* 526, and *Staats* v. *Van Sickel*, 23 *Vroom* 370, would be pertinent unless distinguishable, upon the question whether the married woman, under the peculiar circumstances of the Ming case, was or was not a surety ; but assuming that she was a surety in the contract as finally made, these cases have no tendency to hold her liable in that character.

There was therefore a reasonable and proper occasion for the amendment of 1895 which deals with the liability of a married woman as surety, even though it may be held that the act is merely declaratory.

It was passed soon after the Ming case had appeared in the reports and it is precisely adapted to the facts of that case, the most important elements of which were that the married woman had, on the faith of a note upon which she might by possibility be held to have been an accommodation maker, obtained the proceeds of the note from a creditor not having notice of the accommodation character of it.

The mischief (apprehended and to be guarded against for the future) was that a married woman under such circumstances might escape liability at law.

### THE REMEDY.

" The object sought to be accomplished exercises a potent. influence in determining the meaning of not only the principal but also the minor provisions of the statute. To ascertain it fully the court will be greatly assisted by knowing and is permitted to consider the mischief intended to be removed or suppressed or the necessity of any kind which induced the enactment." *Suth. Stat. Const.*, § 292.

In *Big Black Creek Improvement Co.* v. *Commonwealth*, 94 *Pa. St.* 450, 455, it is said : " Statutes are to be construed so as may best effectuate the intention of the makers, which sometimes may be collected from the cause or occasion of passing the statute, and when discovered it ought to be followed with judgment and discretion in the construction, though that construction may seem contrary to the letter of the statute."

Almost identical language is found in *Tonnele* v. *Hall*, 4 *N. Y.* 140, 144.

In *Associates* v. *Davison*, 5 *Dutcher* 415, 424, this court used the following language : " The principle of construction is that although a matter may fall within the words of the act it shall not control it unless within the reason and spirit also. This principle was acted upon in the case of *Beardsley* v. *Southmayd*, 3 *Gr.* 171 ; *Taberrer* v. *Brentnall*, 3 *Harr.* 262 ; *Howe* v. *Lawrence*, 1 *Zab.* 750 ; *Hoguet* v. *Wallace*, 4 *Dutcher* 523. A thing which is within the letter of a statute is not within it, unless within the intention of the makers. 1 *Bac. Abr.* 5, tit. *"Statute;"* *Stradley* v. *Morgan, Plowd.* 205. When the intention is doubtful the court will interpret the law consonant with equity and what is most convenient. *Kerlin* v. *Bull*, 1 *Dall.* 178; *Crocker* v. *Crane*, 21 *Wend.* 211; *The People* v. *Utica Insurance Co.*, 15 *Johns.* 358."

The proviso of 1895 does not alter the general policy of the law which withholds from married women the power to make contracts of suretyship.

The limitation in that direction of the power conferred by the revision of 1875 is still in the statute, but the amendment of 1895 introduced the principle of *estoppel in pais,* where the woman has obtained some valuable thing from a person in good faith and without notice relying on the contract.

Although the contract of suretyship is still without force in itself as beyond the legal capacity of a married woman, yet if she does in fact make such a contract, and "on the faith of it obtains anything of value," she shall be liable as if sole.

Thus construed, the reason of the statute is supported by many analogous instances when a contract not in itself valid becomes incontestable and a liability thereon arises, by reason of some act done by an innocent party in reliance upon it.

On the other hand, the language is ill chosen to express the idea that a married woman may become a surety in all cases where she receives any benefit from so doing. It does not say that in any case a contract of suretyship shall be valid, but does in effect say that in all cases such contract shall be void. The declaration that then follows, that she shall be liable in case she obtains any valuable thing on the faith of the contract, is very different from saying that the contract itself shall be valid whenever there is a beneficial consideration for it.

The liability contemplated by the statute arises not from the contract itself (whatever may have been the inducement to it), but from the obtaining of value on the faith of it.

(1) The money or valuable thing must have been obtained "on the faith" of the contract of suretyship.

The phrase "on the faith of" is familiar in the law of estoppel and in the law of commercial paper. It is always used to signify action under a belief in something as valid. Faith is belief.

To obtain money, &c., on the faith of a contract is to obtain it on the belief of the validity of such contract, or without notice of the facts which make it void—in good faith.

The construction adopted at the trial which makes "faith"

simply the equivalent of "consideration" or "inducement," does not give the word its proper force.

The statute does not mean that a person who advances money as the inducement to a contract when he believes it to be void, or when he has knowledge of facts which make it void, shall, *ipso facto*, acquire a right to enforce it as valid. He does not in such case act "on the faith" of the contract, for he can have no faith in it, being chargeable in law with knowledge that it is void.

It is his own folly to invest in such a contract, and no tenderness for him requires that a married woman shall be held liable thereon by way of exception to the general policy of the law.

In the present instance, Judge Cowenhoven, from whom the bonus of $80 was obtained, knew perfectly well that Mrs. Eastburn was married, for her husband signed the note with her, and Judge Cowenhoven had previously acted as attorney for them. He also knew of the accommodation character of the paper, for he was the person accommodated.

(2) The money, &c., must have been obtained from the person in whose favor the liability arises.

It seems unreasonable to hold that because Judge Cowenhoven paid Mrs. Eastburn for her signature, the contract is thereby made binding in favor of the creditor.

Such payment cannot possibly give any vitality to the note in the hands of the payee. It only becomes a contract when the payee puts it in circulation for value.

But the endorsee succeeds to no right of the payee (for the payee could not have sued). Why, therefore, should the endorsee have the right to hold the accommodation maker by force of the payment to her by the payee?

The reason and spirit of the act indicate that it is only in consequence of money, &c., obtained by the married woman from himself that the creditor gains a right to hold her. No equity can result in his favor from a payment made by the principal debtor.

(3) A bonus received from the principal debtor is not obtained on the faith of the contract. of suretyship.

At the utmost it is obtained on a promise to make such a contract.

It is obtained for the signature of the surety and for the permission to issue it as a contract.

Judge Cowenhoven paid Mrs. Eastburn for a piece of paper bearing her name and for her authority to put it in circulation.

If it never became a contract he could not demand back the bonus.

(4) The married woman should only be held liable to the extent of the money obtained by her. Since her obtaining the money is the only ground for holding her liable at all (the consideration of detriment to the other party being entirely immaterial), the statute should be so construed as to limit the liability to that amount.

Whatever difficulty there might be in measuring the extent of the liability, where, as in *Perkins* v. *Elliott*, 8 *C. E. Gr.* 526, the benefit to the wife is incapable of exact ascertainment, there is no such difficulty where nothing but money has been obtained.

"A contract for the exchange of unequal sums of money at the same time or at different times, when the element of time is no equivalent is not binding; and in such cases courts may and do inquire into the equality of the contract; for its subject-matter upon both sides has not only a fixed value, but is itself the standard of all values; and so for the difference of value there is no consideration." *Shepard* v. *Rhodes*, 7 *R. I.* 470.

(5) The construction adopted at the trial almost wholly destroys the restriction upon the power of a married woman to become surety—a restriction still in terms retained in the act.

For in that view the restriction can always be evaded by the payment of a trifling sum to the wife to fix her liability.

In the present case the payment to defendant of $80 by a

person having full knowledge of her disability was held to make her liable for $2,000, and upon the same reasoning $10 would have sufficed to bind her for $10,000.

If this be the law, then the statute has wholly ceased to protect a married woman in respect to contracts of suretyship. A protection so easily circumvented may as well be said not to exist.

A construction of a proviso will not be adopted which will make it almost entirely destroy the enactment upon which it is engrafted. *Austin* v. *Nelson*, 1 *Halst.* 383, 387.

On the other hand, if due effect is given to the words " on the faith of " the contract by requiring that the person advancing the money shall have acted without notice of its invalidity, there is no room for evasion, and the act serves a salutary purpose of preventing fraud without becoming a means of imposition upon a class of persons whom the law has always been solicitous to shield.

(6) The intention of enabling a married woman to trade on her credit should not be attributed to the legislature if another construction can reasonably be given to the act. A power not only so entirely at variance with all previous legislation, but so dangerous in itself and destitute of usefulness or reasonable purpose, should be viewed with the utmost jealousy.

This act is to be strictly construed. *Suth. Stat. Con.*, *p.* 512, § 400.

A due consideration of the reason and spirit of this act and its effects and consequences, as well as of the language itself, forbids that such a construction be placed upon it as has been given to it in the court below.

The judgment therefore should be reversed.

For the defendant in error,. *John S. Voorhees.*

I. Our Married Women's act of 1895 provides that any married woman shall " have the right to bind herself by contract with any person in the same manner and to the same extent as though she were unmarried, which contract shall be

legal and obligatory and may be enforced at law and in equity by or against such married woman in her own name apart from her husband; provided, that nothing herein shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt or answer for the default or liability of any other person; provided further, however, that if, on the faith of any endorsement, contract of guarantee or suretyship, promise to pay the debt or answer for the default or liability of any other person, any married woman obtains directly or indirectly any money, property or other thing of value for her own use or for the use or benefit or advantage of her separate estate, she shall be liable as though she were unmarried." *Gen. Stat., p.* 2017, § 26.

In view of the clear and explicit language of the second proviso to this act, it is difficult to see how there can be any question left open to serious discussion in this case, for the statute provides that a *feme covert* will be liable upon her contract of guarantee if she receives anything of value in consideration for her contract, and the court in its charge left the jury to determine the question as to whether in this case the plaintiff in error received any such consideration.

This act is the last of a series of successive steps by which the right of married women to contract has been gradually freed from the shackles of the common law. At common law a *feme covert* could practically conclude no contract, because she could hold no property upon which her contract could operate.

It was not so much that she could make no contract, as that she could hold no property.

To avoid the harsh provisions of the common law by which all the property of a married women by force of the marriage relation at once fell into the husband's estate, equity permitted her to hold property through the medium of trustees. Some of the English Chancellors have said that this was intended to protect the wife from the duress of the husband. *Whistler* v. *Newman,* 4 *Ves.* 129; *Mores* v. *Huish,* 5 *Id.* 692.

It is more accurate to say it was intended rather to prevent the operation of the strict rule of the common law.

The title to property so held by the wife was considered by the law as vested in the trustees. Equity, on the other hand, recognized the rights of the wife. At law, therefore, the *feme covert* could make no contract affecting this, her separate estate, while Chancery recognized her right to contract with reference to it as a *feme sole. Jaques* v. *Methodist Episcopal Church,* 17 *Johns.* 548.

The spirit of the earlier, as well as of the later English cases, is that the equitable estate of a *feme covert* is liable for the payment of all her equitable debt to the same extent as though such debts were contracted by a *feme sole. Willard Eq. Jur.* 647.

This equitable rule was early recognized by our Court of Chancery at least so far as to enable a married woman to dispose of her separate estate in any way not inconsistent with the terms of the instrument under which she holds. *Leaycraft* v. *Hedden,* 3 *Gr. Ch.* 512.

When our Married Women's act of 1852 (*Pamph. L., p.* 40) had enlarged a wife's right to hold property by enabling her to hold her real and personal estate in her own right as her sole and separate property as if she were a single female, her right to contract debts to be charged upon her separate estate was correspondingly enlarged. Recovery, however, could still be had only in equity. *Armstrong* v. *Ross,* 5 *C. E. Gr.* 109; *Oakley* v. *Pound,* 1 *McCart.* 178.

In 1862 a provision was made by the legislature for the recovery of unsatisfied debts or claims contracted by a married woman "in the transaction of any business" by suit against the husband and wife in courts of law, the judgment to bind the property of the wife. *Pamph. L.* 1862, *p.* 271.

This act gave no additional power to contract. It only recognized her power to contract in reference to her separate estate for such debts as could before have been charged against it in equity and gave a remedy for such debts in the courts of law. *Eckert* v. *Reuter,* 4 *Vroom* 266.

This act was held to apply only to business in which the *feme covert* was beneficially interested, and so not to make her liable at law as surety upon a promissory note. " If the contract was for the benefit of the *feme*," said Chief Justice Beasley, who wrote the opinion, " there would be no question with regard to the sustainability of the action." *Van Kirk* v. *Skillman,* 5 *Vroom* 109.

This case seems to imply that a married woman's accommodation endorsement would be good in equity, but the contrary was held by Chancellor Zabriskie in *Peake* v. *La Baw,* 6 *C. E. Gr.* 269. The brief of the present Chief Justice, who was counsel for the complainant, printed in full with the case, nevertheless shows how much authority there was for holding her liable when she was a mere surety.

Thus, in equity a *feme covert* was doubtless liable for her promissory note where she had received a consideration for her signature, and the sufficiency of such consideration rested wholly with herself.

Without the aid of the act of 1895, Mrs. Eastburn would be liable upon the note now in question. Recovery could be had in equity, if not under the act of 1862, at law.

The question came squarely before the court in the case of *Perkins* v. *Elliott,* 8 *C. E. Gr.* 526, in which recovery was had upon a joint and several promissory note executed by a married woman with her husband, for the purpose of relieving the husband's lands from a mortgage, upon the ground that the wife derived a benefit to her dower right by the transaction.

The court, speaking through Chief Justice Beasley (at *p.* 535), said : " In testing the wife's right to act as a *feme sole,* the only question is whether she is to derive any benefit from the transaction, for if such benefit is to accrue, her right to bind herself is unquestionable. In the absence of fraud or imposition this court cannot attempt to measure the adequacy of the interest which has induced her action. Whenever her property or rights are involved she has a competency to con-

tract and consequently must decide for herself as to the value of that which she will acquire by an outlay of her money or as an equivalent for her engagements."

The act of 1895, therefore, simply puts in statutory form and makes available at law a rule which has been heretofore enforced in our courts of equity.

II. It is submitted the plaintiff in error does not come within the first proviso of the Married Women's act. If she received a consideration for her note, she is not "an accommodation endorser, guarantor or surety," nor is she now called upon to "pay the debt or answer for the default or liability of any other person."

An accommodation bill is one to which the accommodation party has put his name without consideration. *Byles Bills* (*6th ed.*) *128, *405; 2 *Rand. Com. Pap.*, § 472; 1 *Dan. Neg. Inst.* 191; 1 *Pars. Cont.* 184.

In this case Mrs. Eastburn simply sold her credit. It was, or might have been, a profitable business, for she received about twelve per cent. ($80 every four months) for the use of her name, and was secured against loss by an exchange of notes. Even if Judge Cowenhoven's note to her was a memorandum note, it became her property and available in case she had to pay her own.

As Mr. Justice Dixon said, in the case of *First National Bank of Cranbury* v. *Dohm*, 23 *Vroom* 363, in which a married woman had given her own note to one of her husband's creditors in exchange for one of her husband's, her note was an original promise to pay the price of property purchased by her, and hence created a legal obligation, and the court will not inquire into the adequacy of the consideration.

In *Staats, Executor*, v. *Van Sickle*, 23 *Vroom* 370, 560, a married woman was held bound by her obligation given to secure a part of the purchase-money of certain lands conveyed to the husband.

In *Todd* v. *Bailey*, 29 *Vroom* 10, a married woman was

held liable on her note given for money to be turned over to the husband.

In *Bebberdick* v. *Crevier*, 31 *Vroom* 389, it was held that the note of a married woman, given to pay off an encumbrance upon the husband's lands, was enforceable.

In First National Bank *v.* Dohm, the court said the first proviso in the act in question " is in substance indistinguishable from one of the provisions of the statute of frauds which requires a writing in order to charge a promise to answer for the debt, default or miscarriage of another person, and should receive the same construction."

That is to say, a consideration sufficient to sustain an executory contract when not reduced to writing would sustain a contract made by a *feme covert*.

But under the statute of frauds a purchaser cannot allege that the benefit which he received did not bear a just proportion to the price he agreed to pay.

The debt may be grossly disproportionate to the consideration, and the payment of $5 may sustain an oral guarantee of a debt of $500 or a larger sum. 1 *Sm. Lead. Cas. (8th ed.)* 548, 551 ; 4 *Am. & Eng. Encycl. L.* (*2d ed.*) 188, 189.

Again, it is held that in order to make the statute of frauds applicable, the immediate object for requiring the defendant's liability must be to pay the debt of another.

An illustration of this is an agent who sells under a *del credere* commission. Under his contract he may become liable for the debt of another, but the immediate object of his contract is not the assumption of such debt but the obtaining of an enhanced commission. *Sm. Cont.* (*5th ed.*) *92, 105, 108 ; 2 *Pars. Cont.* (*5th ed.*) 12.

In this case the immediate object of Mrs. Eastburn in giving the note in question, was not to become surety but to earn the bonus, and she is therefore bound by it.

It is submitted there was no error in the judge's charge. The statute is so clear, however, that this discussion of the question is no doubt unnecessary.

The opinion of a plurality of the court was delivered by

GUMMERE, J.   The plaintiff in error, together with her husband, was sued upon a joint and several promissory note for $2,080, made by them to the order of one Cowenhoven, and endorsed by him to Vliet, the defendant in error.   The note in suit was the third or fourth renewal of an earlier one of like character, which had been made for the accommodation of Cowenhoven, and upon which he had received from Vliet, before its maturity, the face amount less a proper discount.   No part of the proceeds of the note went to Mrs. Eastburn's benefit or was received by her.   She was, however, paid a bonus of $80 by Cowenhoven, for the use of her name, at the time of her signing the first note, and a like amount at the time of signing each renewal.   She now seeks to escape liability upon the ground that she is a married woman, and, so, cannot bind herself by a contract such as that in suit.   Whether she can succeed in her attempt must depend upon the effect of the Married Women's act, section 5, as amended in 1895, and which reads as follows :

"Any married woman shall, after the passing of this act, have the right to bind herself by contract with any person in the same manner, and to the same extent, as if she were unmarried, which contracts shall be legal and obligatory, and may be enforced at law or in equity, by or against such married woman, in her own name apart from her husband ; provided, that nothing herein shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt or answer for the default or liability of any other person ; provided further, however, that if, on the faith of any endorsement, contract of guaranty or suretyship, promise to pay the debt, or to answer for the default or liability of any other person, any married woman obtains, directly or indirectly, any money, property or other thing of value, for her own use, or for the use, benefit or advantage of her separate estate, she shall be liable thereon as though she were unmarried,

anything herein contained to the contrary notwithstanding."
*Gen. Stat., p.* 2017.

Under the provisos of this statute a contract of suretyship
entered into by a married woman is altogether void unless,
*upon the faith of such contract,* she obtains money, property
or other thing of value for her own use or for the benefit,
&c., of her estate. Although, in form, Mrs. Eastburn be-
came an original debtor by signing the note in suit, she was
in fact merely a surety for Cowenhoven, having put her
name to the paper for his accommodation. *Jackson* v. *First
National Bank,* 13 *Vroom* 177; *Van Deventer* v. *Van Deven-
ter,* 17 *Id.* 460; *Woolverton* v. *Van Syckel,* 28 *Id.* 392.

Ordinarily, in an action at law upon a promissory note
made by two persons, one of them cannot set up as a defence
that he was, to the knowledge of the payee, an accommo-
dation maker, and therefore entitled to the privileges of a
surety, the reason being that his right to have his *status* as
surety respected does not pertain to his contract as an implied
incident, but is a mere equity, which it is irregular to enforce
in a court of common law. *Anthony* v. *Fritts,* 16 *Vroom* 1;
*Shute* v. *Taylor,* 32 *Id.* 256. But, as was pointed out in the
latter case, this is a matter which concerns not rights but
only remedies, and consequently has no application where
the ability to make such a contract is denied by positive law.
If it was otherwise the validity of a contract of this character
would depend upon the form rather than its substance, and
the prohibition of the statute would be rendered entirely
ineffectual merely by a representation on the part of a mar-
ried woman that she contracted as a principal and not as a
surety. Where the law prohibits the making of a contract,
a false representation of the fact which avoids the contract
will not render it obligatory. *Cannam* v. *Farmer,* 3 *Wels.,
Hurls. & Gor.* 698; *Loan Association* v. *Fairhurst,* 9 *Id.*
422; *Den, Hopper* v. *Demarest,* 1 *Zab.* 525; *Lowell* v. *Dan-
iels,* 2 *Gray* 161.

Although the right to set up such a defence in a case like
the present has never received discussion in this court, it

was necessarily involved and assumed to exist in the case of *Woolverton* v. *Van Syckel, supra.* In that case plaintiff brought suit on a joint and several promissory note given by Woolverton and his wife to plaintiff's decedent. At the trial both of the defendants were called to show that the wife signed the note for the accommodation of her husband, but were not permitted to do so by the trial judge on the ground that they were incompetent to testify upon the subject. It was declared by this court, all the judges concurring, that it was admissible for the wife " to show that no consideration passed to her for her signature, and that when she signed it she was a married woman, and her signature was affixed for the accommodation of her husband." The reason given for considering the testimony admissible was that "such a contract was one of suretyship, which, on the part of a married woman, is unlawful." Obviously, this testimony could only be admissible on the theory that a married woman is entitled to set up as a defence to a note, of which she is one of the makers, that her contract, although in form that of a principal debtor, is in fact one of suretyship.

We conclude that, notwithstanding the contract of Mrs. Eastburn was not in form one of suretyship, she is not, for that reason, precluded from showing that such was its nature in fact. Her liability, consequently, depends upon whether the contract is within the second proviso of the act of 1895. In other words, whether she obtained for her own use any money or other thing of value " on the faith of the contract."

As has already been stated, she received at the time of signing the original note, and again upon signing each of the renewals, the sum of $80 from Cowenhoven, the person for whose benefit she made the contract. Counsel contends that this does not bring the case within the proviso, that, in order to have that effect, the money or thing of value must be obtained by the married woman from the person to whom the note is assigned by the payee. But this is equivalent to saying that, in order to render her liable as accommodation

maker, she must receive a part of the consideration of the note, which is manifestly not the intention of the statute, for if she should share in the proceeds of the note she would be a principal debtor and not a surety at all.

The evident intent of the legislature, in adding this second proviso to the statute, was to enlarge the scope of a married woman's contracting power, to enable her to become an accommodation endorser, guarantor or surety, or to bind herself for the debt, &c., of another person, provided that she should receive, *from the person for whose benefit she made the promise, or on his behalf,* money or other thing of value as a consideration for her undertaking.

With the wisdom of so increasing the capacity of a married woman to contract we have nothing to do. That is a matter which rests altogether with the legislature, and they have dealt with it. If it shall be found to be objectionable, that branch of the government may be relied upon to remedy the evil.

It is further argued that the liability of a married woman, upon a contract such as that under consideration, if it exists at all, exists only to the extent of the money obtained by her. But this contention can only be permitted to prevail by disregarding the plain and unambiguous language of the statute, which declares that the liability of a married woman on a contract of suretyship, under the conditions mentioned, shall be the same "as though she were unmarried." If an unmarried woman had made such a contract as the plaintiff in error, the extent of her liability would be measured by the terms of her undertaking without regard to whether the consideration received by her for doing so was great or small.

The judgment under review should be affirmed.

DIXON, J. The circumstances which present the real question in this case are sufficiently stated in the opinion of Mr. Justice Gummere. That question is, whether the contract on which the plaintiff sued was within the proviso of our Married Women's act, which confers on married women

a general power to contract, " provided, that nothing herein shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt or answer for the default or liability of any other person."

The obligations specified in this proviso are all of a nature well defined in the law, and each of them implies, as well in the legal as in the common acceptation of the terms, a principal liability of a third person to the creditor. The non-existence of such a liability in the contract into which the plaintiff entered, excludes that contract from the proviso.

When Mrs. Eastburn delivered to Cowenhoven her promissory note payable to his order, and gave him unlimited authority to negotiate it, the transaction did not, of itself, impose upon her any obligation for the payment of money, but it created an agency in Cowenhoven by which he was empowered to contract for her to any extent within the terms of the note. When he endorsed the note to the plaintiff, receiving therefor the amount of money named in it, then first did Mrs. Eastburn enter into a contract, and that contract was not, either in form or in substance, that she would be surety or guarantor for Cowenhoven or would answer for him in any way, but was, both in form and in substance, that she would unconditionally pay the note at maturity to the plaintiff or his assigns, and would be primarily and originally liable therefor.

In addition to this contract thus entered into by Mrs. Eastburn, through Cowenhoven as her agent, Cowenhoven also contracted for himself as endorser, but his contract with the plaintiff was secondary, and in nowise affected the contract of Mrs. Eastburn. If Cowenhoven had endorsed the note without recourse, his act would still have been within the scope of his authority from Mrs. Eastburn, and the nature of her contract with the plaintiff would have been precisely the same as it is now. Such an endorsement would perhaps have made the situation simpler, since her contract would then have been the only one to which the plaintiff was a

party, and the absence of any third person responsible to the creditor might render it clearer that her contract was not within the proviso of the statute, but her contract would not have differed in any respect from that now subsisting between her and the plaintiff.

If, under the present endorsement, the plaintiff had omitted to give Cowenhoven due notice of the non-payment of the note at maturity, the situation would have become the same as if Cowenhoven had endorsed without recourse; Cowenhoven would have been under no responsibility to the plaintiff, but the obligation of Mrs. Eastburn to the plaintiff would have remained, and clearly it could not have been secondary.

What I regard as the incorrectness of the views of my associate's results, I think, from one of two sources: either they confuse, with the contract between Mrs. Eastburn and the plaintiff, the contract between Mrs. Eastburn and Cowenhoven, by which the latter was bound to repay to her whatever she paid to the plaintiff, an obligation of which the plaintiff had no knowledge and which had no place in the contract between him and Mrs. Eastburn; or else they regard the note as showing only the form, and not the substance, of Mrs. Eastburn's contract with the plaintiff, when, in truth, it shows both form and substance, since it embodies all there was of contractual material between them. The fact that an extraneous, independent contract between Mrs. Eastburn and Cowenhoven bound the latter to the former *in the same manner* as if he had been the principal debtor to the plaintiff, and she, the surety, could not make Cowenhoven *really* a debtor to the plaintiff, and so could not make Mrs. Eastburn *really* a surety to the plaintiff.

In my opinion, Mrs. Eastburn's contract with the plaintiff falls within the general purview of the statute authorizing married women to contract, and not within the proviso limiting their power, and therefore the judgment in favor of the plaintiff should be affirmed.

VAN SYCKEL, J. (dissenting).    Isabella Eastburn and her husband were sued upon a promissory note for $2,080, made by them to the order of Charles T. Cowenhoven, and endorsed by him to Daniel Vliet, the plaintiff.

The note was given for the accommodation of the payee, who received from Vliet the face value of the note less the discount.

No part of the money paid by Vliet was for the benefit of Mrs. Eastburn, but there was evidence tending to show that Cowenhoven paid her $80 for signing the note.

The question of the wife's capacity to bind herself is involved in this case, and, therefore, we must lay out of view that the plaintiff is a *bona fide* holder for value, because he cannot hold the wife to any greater extent than she has capacity to contract.

Our statute gives a married woman the right to contract in the same manner and to the same extent as though she were unmarried, subject, however, to two provisos :

*First.* That nothing in said act shall enable such married woman to become an accommodation endorser, guarantor or surety, nor shall she be liable on any promise to pay the debt, or answer for the default or liability of any other person.

*Second.* That if on the faith of any endorsement, contract of guaranty or suretyship, promise to pay the debt, or to answer for the default or liability of any other person, any married woman obtains, directly or indirectly, any money, property or other thing of value for her own use, or for the use, benefit or advantage of her separate estate, she shall be liable thereon as though she were unmarried, anything herein contained to the contrary notwithstanding.

In this case the wife received a small sum of money—$80 —for signing a note for a large amount, and, therefore, possibly under a very strict and narrow construction of the language of the second proviso she might be held as if she were unmarried.

But that view of the statute is too contracted ; it evidently deprives the wife of the protection which the law intended

to throw around her, and fails to apply a cardinal rule for the interpretation of statutes, that you must regard the old law, the mischief and the remedy to discover the intention of the lawmaker.

The act of 1874 did not contain the second proviso above recited, that first appears in the act of 1895, under which this controversy has arisen.

Under the act of 1874 the wife was entirely without capacity to make an accommodation endorsement, or to become a surety or guarantor. Such was the policy and clear expression of the positive law.

The apprehended evil which led to the change of the act in 1895, by adding the second proviso, was that the wife might receive money for her own benefit without incurring any responsibility whatever by making her contract, and thereby commit a wrong.

The introduction of the second proviso into the act was, it may be, suggested by the discussion in the case of *Hackettstown National Bank* v. *Ming*, 7 *Dick. Ch. Rep.* 156.

Subject to the second proviso, however, the act of 1895 expressly incapacitates the wife to make an accommodation note or to become guarantor or surety.

The policy and intent of the law still clearly is to protect the wife from the danger of being imposed upon through the influence of her husband or any other person.

That protection is not intended to be withdrawn, but, on the contrary, is expressly retained.

She is made liable by the second proviso, not because she is the accommodation endorser or guarantor or surety, but only for the reason that she receives a consideration for her contract.

It is the receiving of the consideration which binds her. To the extent that the sum she engages to pay exceeds the amount she receives for signing the note, the statute would be evaded and she would be deprived of its protection, if the contract is enforced against her as if she were unmarried.

The statute should receive a liberal construction, so that its

manifest policy and purpose shall be effectuated and not defeated.

If, by the simple device of paying the wife $5 to join in a note as surety for $2,000, her incapacity to make such contract is removed, the statute is practically a dead letter. It may be confidently asserted that such was not the legislative intent.

In my judgment, the wife is liable only to the extent of the consideration she receives.

The case stands as if she had given her promissory note for $2,000, and had received from the payee only $100 for signing it.

In such case the amount of the consideration will measure the liability of the maker, and that should be the rule in this case.

No matter in what form the wife lends her name, whether as maker, endorser, surety or guarantor for another, to the extent that her contract is without consideration to herself or without benefit to her separate estate, her incompetency to execute it constitutes an insurmountable obstacle to recovery upon it. The judgment below should be reversed.

GARRISON, J.   I concur in the above exposition of the law, but I do not think that the money, to wit, the sum of $80 paid to the married woman to obtain her signature to the note, was "money obtained by her on the faith of her contract."

*For affirmance*—MAGIE (CHANCELLOR), DIXON, LIPPINCOTT, GUMMERE, LUDLOW, BOGERT, VOORHEES.   7.

*For reversal*—DEPUE (CHIEF JUSTICE), VAN SYCKEL, GARRISON, HENDRICKSON, ADAMS, VREDENBURGH.   6.